## EXHIBIT 2

**Certification of Japanese Sale Approval (English Translation)**

I hereby certify that this Petition was approved on February 26, 2018.
February 26, 2018    Toru Kagaya, Registrar of Tokyo District Court, 20th Civil Division (seal)

2017 (*sai*) No.20: Case of Petition for Commencement of Rehabilitation Proceedings

## Petition for Approval for Business Transfer

## (Article 42 of the Civil Rehabilitation Act)

To: Tokyo District Court, 20th Civil Division

January 22, 2018

Rehabilitation Debtor:    Takata Corporation

Attorney for the Rehabilitation Debtor:

Attorney-at-Law, Nobuaki Kobayashi

### I. Approval Requested

The rehabilitation debtor, together with Takata Kyusyu Corporation ("**TK9**") and Takata Service Corporation ("**TKS**") (each respectively a subsidiary of the said rehabilitation debtor), seeks approval to transfer part of the business of the rehabilitation debtor to Joyson KSS Auto Safety S.A. and its subsidiaries and affiliates (individually or collectively, "**KSS**"), based on (1) Attachment 1, the "Japan Asset Purchase Agreement" (including the Amendment Agreements and the further amendments thereafter, the "**Japan-APA**"); (2) Attachment 2, the "First Amendment to Asset Purchase Agreement;" (3) Attachment 3, the "Second Amendment to Asset Purchase Agreement;" and (4) Attachment 4, the "Third Amendment to Asset Purchase Agreement" (hereinafter, (2) through (4) shall be collectively referred to as the "**Amendment Agreements**").

01:23100510.1

### II. Reasons

1

**1. Introduction**

The rehabilitation debtor and its subsidiaries and affiliates in different countries throughout the world (collectively, the "**Rehabilitation Debtor Group**") plans to transfer to KSS substantially all of the business globally operated by the Rehabilitation Debtor Group, except for the assets and business pertaining to the inflator using phase-stabilized ammonium nitrate (the "**PSAN Inflator**"). Such global business transfer will be conducted by means of four (4) business transfer agreements, i.e., (1) the Japan-APA, which is the agreement of the business transfer in Japan and other Asian countries, etc.; (2) the agreement of the business transfer in the United States, Mexico, South America, etc. (the "**US-APA**"); (3) the agreement of business transfer in Europe, etc. (the "**EMEA-APA**"); and (4) the agreement of the business transfer of Takata (Shanghai) Automotive Component Co., Ltd. ("**TSAC**"), a Chinese subsidiary of the rehabilitation debtor (the "**TSAC-APA**," which is scheduled to be executed hereafter). Further, (1) Japan-APA was executed on November 16, 2017 and consented by the Supervisor on January 15, 2018. Therefore, a petition is hereby made to seek approval to be granted to transfer the business based on the Japan-APA outside of the rehabilitation plan (Article 42 (1) of the Civil Rehabilitation Act).

**2. Background of the execution of the Japan-APA**

(1) The Rehabilitation Debtor Group manufactures, among other products, airbag modules (the "**Airbag(s)**") that include the PSAN Inflators and sells them to original equipment manufacturers of automobiles (the "**OEMs**"). With respect to the Airbag, defects pertaining to the PSAN Inflator had been identified, including the occurrence of fatal accidents, etc., caused by metal shards shooting out of rupture of PSAN Inflators which are the components to inflate the airbags by generating gas. Consequently, on and after November 2008, the OEMs initiated recalls

2

including voluntary remedy programs with regards to the vehicles that installed the Airbag, eventually expanding the coverage thereof.  Pursuant to such circumstance, TK HOLDINGS INC. ("**TKH**"), a U.S. subsidiary of the rehabilitation debtor, agreed to the Consent Order between the United States Department of Transportation, National Highway Traffic Safety Administration (the "**NHTSA**") in May and November 2015, in substance to (1) conduct additional recalls with respect to the Airbags; and to (2) impose against TKH the duty to pay a civil penalty in the amount of 70 million U.S. dollars in installments, etc. Shortly thereafter, the Ministry of Land, Infrastructure, Transport and Tourism of Japan also instructed the rehabilitation debtor to expand the recall regarding the PSAN Inflators in Japan.  The OEMs have claimed, or it was assumed that they would claim, the right to indemnification and other rights (the "**Recall Claims**") against the Rehabilitation Debtor Group pertaining to the expenses, etc., incurred by the OEMs in relation to the series of abovementioned recalls (the "**Recalls**"), and the amount thereof was expected to increase.  Further, in relation to the Airbag defects, numerous judicial actions have been filed, and it was expected that similar judicial actions would be filed in the future, against the rehabilitation debtor.

(2) In light of such circumstances, in February 2016, in order to develop a restructuring plan for the Rehabilitation Debtor Group, the rehabilitation debtor established an external steering committee (the "**SC**") consisting of five (5) experts in restructuring and entrusted the SC to develop a restructuring plan for the Rehabilitation Debtor Group.   Considering that the OEMs are the largest creditors of the rehabilitation debtor and the most significant business partners for the Rehabilitation Debtor Group to continue its business, the rehabilitation debtor desired a sponsored-type restructuring as opposed to an unaided-type restructuring in order to maintain quality control over the products of the Rehabilitation Debtor Group, the SC decided to select a

01:23100510.1

3

sponsor, and appointed Lazard Frères & Co. LLC and Lazard Frères K.K. (collectively, "**Lazard**")

as a financial advisor to take initiative in the selection of a sponsor for the Rehabilitation Debtor

Group in May 2016 after consultation with the rehabilitation debtor.    Taking into account the fact

that the businesses of the Rehabilitation Debtor Group are closely associated with each other on

a global scale and the OEMs being the significant business partners had requested a global

supply system, SC and Lazard estimated that, in order to maximize the sales value of the

Rehabilitation Debtor Group as a whole, it was preferable to sell the business altogether as a

whole (except for the business and assets related to production of PSAN Inflators), and, after

consultation with the rehabilitation debtor, SC and Lazard decided to select a single sponsor on a

global scale.


(3) In June 2016, after hearing the initial intention from major OEMs holding Recall Claims against

the Rehabilitation Debtor Group, Lazard broadly sought for sponsor candidates by contacting forty

(40) companies on a global basis.    Subsequently, under Lazard's initiative, a large number of

sponsor candidates participated and the procedure for selecting the sponsor for the Rehabilitation

Debtor Group was conducted, including (1) due diligence of the Rehabilitation Debtor Group; (2)

on-site visits to the plant facilities, etc., of the Rehabilitation Debtor Group in various countries

around the world; (3) management presentations by the Rehabilitation Debtor Group; and (4)

holding multiple meetings with participation of the sponsor candidates, OEMs and management

from the Rehabilitation Debtor Group.


(4) On January 13, 2017, the rehabilitation debtor entered into a plea agreement with the United

States Department of Justice (the "**DOJ**") (the "**Plea Agreement**"). Based on the Plea

Agreement, the rehabilitation debtor became obligated to pay 850 million US dollars (the "**DOJ**

01:23100510.1

4

**Restitution Award**") to the restitution fund for the benefit of the OEMs who were the victims of the conducts and acts stated in the Plea Agreement.   As stated in (2) above, since prior to the execution of the Plea Agreement, it was contemplated that the Rehabilitation Debtor Group is restructured with sponsor's support.   Therefore, the Plea Agreement stipulates that the rehabilitation debtor shall close the sponsorship agreement by February 27, 2018 and pay the DOJ Restitution Award within five (5) days from the said closing.   Under the Plea Agreement, if the rehabilitation debtor is not able to fulfill the duty of making the said payment, which payment may be supported by the rehabilitation debtor's subsidiaries and affiliates, before the said due date, the DOJ may cancel the Plea Agreement, and in this event, the DOJ may bring a legal action against the Rehabilitation Debtor Group, and a significant amount of penalty exceeding 850 million US dollars (which was decided upon through reconciliation under the Plea Agreement) may be imposed on the Rehabilitation Debtor Group.   Accordingly, the Rehabilitation Debtor Group's payment of the DOJ Restitution Award is indispensable for restructuring the global business thereof as a whole.   Concurrently, since the Rehabilitation Debtor Group has insufficient financial resources to pay the DOJ Restitution Award by itself, it became necessary for the Rehabilitation Debtor Group to close the sponsorship agreement with a sponsor who would be able to support the global business as a whole, in order to receive funds from the sponsor in an amount exceeding the DOJ Restitution Award.

(5) On February 3, 2017, SC recommended KSS to the rehabilitation debtor as a sponsor candidate for the Rehabilitation Debtor Group, considering that: (1) KSS proposed the highest and best offer concerning the purchase price, considerably exceeding the price offered by other sponsor candidates; (2) it appeared that there was more certainty for KSS to perform the sponsorship agreement since KSS has lower antitrust risk than other contending sponsor

01:23100510.1

5

candidates; (3) KSS is considerably ahead with the due diligence process; and (4) the OEMs that constitute the Customer Group, who are major customers of the Rehabilitation Debtor Group and customers of the sponsor, expressed their support for KSS, among other facts.   Subsequently, the Rehabilitation Debtor Group, KSS and the OEMs intensively negotiated focusing on the terms and conditions of the agreement for KSS to assume the business of the Rehabilitation Debtor Group, and the rehabilitation debtor and KSS made the first step by reaching a basic, non-binding agreement on June 26, 2017 with regard to the transfer of the assets and business of the Rehabilitation Debtor Group, prior to the filing of the petition for commencement of rehabilitation proceedings by the rehabilitation debtor.

(6) After the rehabilitation debtor filed the petition for commencement of rehabilitation proceedings on the same day, the Rehabilitation Debtor Group advanced the consultations and negotiations with KSS aiming to execute final agreements and, after obtaining consent from the Supervisor, the Rehabilitation Debtor Group and KSS entered into the US-APA and EMEA-APA on November 16, 2017.   Moreover, the Japan-APA as set out in Attachment 1 was also executed on the same day subject to the consent by the Supervisor, and such consent was subsequently obtained from the Supervisor on January 15, 2018.

**3. Necessity to execute the Japan-APA**

**(1) It is necessary to transfer the business under the Japan-APA for rehabilitation of the rehabilitation debtor's business (Article 42 of the Civil Rehabilitation Act)**

As stated in 2 (1) above, it is necessary for the Rehabilitation Debtor Group to seek drastic business restructuring since the Rehabilitation Debtor Group faces a financial crisis due to being subject to the considerable amount of claims pertaining to the Recall Claims and the filings

01:23100510.1

6

of judicial actions in relation to the Airbag defects.    The OEMs who are the largest creditors of the Rehabilitation Debtor Group and the most significant business partners of the Rehabilitation Debtor Group for the continuation of business thereof support a sponsored-type restructuring which enables the Rehabilitation Debtor Group to be sold as a global business, from the point of view of the quality control of the products and the maintenance of the global supply system of the Rehabilitation Debtor Group.    Furthermore, since the rehabilitation debtor is obligated to make payment of the DOJ Restitution Award in the amount of 850 million US dollars under the Plea Agreement as a condition to closing the sale to KSS, as stated in 2 (4) above, the Rehabilitation Debtor Group's payment of the DOJ Restitution Award is indispensable for restructuring the global business thereof.    For this purpose, it is also necessary to close the business transfer agreement with the sponsor in order to receive the purchase price exceeding the amount of the DOJ Restitution Award.

Hence, it is necessary for the Rehabilitation Debtor Group to transfer its business to KSS under the Japan-APA for rehabilitating the rehabilitation debtor's business (Article 42 of the Civil Rehabilitation Act).

(2) **It is required to transfer the business outside the plan**

As stated in 2 (4) above, under the Plea Agreement, the Rehabilitation Debtor Group is obligated to close a sponsorship agreement with a sponsor before February 27, 2018 and to make payment of the DOJ Restitution Award within five (5) days thereafter.    Meanwhile, since the deadline for the rehabilitation debtor to submit the proposed rehabilitation plan is February 28, 2018, considering the deadline to perform the duty to make payment of the said DOJ Restitution Award, the Rehabilitation Debtor Group cannot wait for the business transfer under the rehabilitation plan, and it is required to transfer the business earlier by means of business transfer outside the

01:23100510.1

7

plan (Article 42 of the Civil Rehabilitation Act).

**4. Reasonableness of entire global business transfer**

**(1) KSS was selected as a sponsor appropriately through fair process**

As stated in 2 above, under the SC, the procedure for selecting the sponsor for the Rehabilitation Debtor Group was led by Lazard, a financial advisor with experience and expertise in selection of a sponsor in a business restructuring phase. Moreover, SC and Lazard contacted candidates who may be potential sponsor candidates for the rehabilitation debtor on a global and broad basis. SC and Lazard also requested the OEMs, who are the largest creditors of the Rehabilitation Debtor Group and are the most significant business partners of the Rehabilitation Debtor Group for continuing its business, to recommend other sponsor candidates if any. Accordingly, appropriate and fair procedure has been followed in the process of selecting the sponsor.

Further, KSS, which was ultimately selected as the sponsor had offered the highest price in the amount of 1,588 million US dollars as the purchase price considerably exceeding the prices offered by other sponsor candidates, and the amount of such price is sufficient to fulfill the obligation to make the payment in the amount of 850 million US dollars under the Plea Agreement. Moreover, since KSS has lower antitrust risk under than other contending sponsor candidates, KSS may perform the sponsor agreement with more certainty while maintaining the global supply system, and time necessary to receive approval of the transaction from the antitrust authority is expected to be shorter. In addition, the Rehabilitation Debtor Group, following the discussions with the OEMs who are the largest creditors and also are the major customers of the Rehabilitation Debtor Group, understands that the OEMs support the transaction and business transfer to KSS. Further, KSS has sufficient competence to carry out the business after

01:23100510.1

8

acquiring the Rehabilitation Debtor Group's business since KSS is a company which manufactures and supplies on a global basis automotive safety components including airbags.

**(2) Entire structure of global business transfer**

The Rehabilitation Debtor Group intends to transfer to KSS substantially all of its global business, except for business and assets related to the PSAN Inflators, and KSS intends to acquire such global business of the Rehabilitation Debtor Group altogether as a whole.   Such global business transfer is planned to be executed by means of four (4) business transfer agreements, i.e., (1) the Japan-APA, which is the agreement of business transfer in Japan and other Asian countries, etc.; (2) the US-APA, which is the agreement of business transfer in the United States, Mexico, South America, etc.; (3) the EMEA-APA, which is the agreement of business transfer in Europe, etc.; and (4) the TSAC-APA, which is the agreement of business transfer of TSAC, a Chinese subsidiary of the rehabilitation debtor (as stated in 1 above, the TSAC-APA is scheduled to be executed hereafter).   Given the global nature of the transaction with KSS, under each of these business transfer agreements, satisfaction or waiver of the conditions to close other business transfer agreements is a condition to closing of the respective business transfer, and as it is also provided that if any business transfer agreement is terminated, other business transfer agreements may also be terminated, thus, each of these business transfer agreements substantially constitutes an integrated agreement as a whole.

According to the scheme of these business transfers, (i) the sellers under the Japan-APA will transfer the business outside of the rehabilitation plan (Article 42 (1) of the Civil Rehabilitation Act) in the rehabilitation proceedings; (ii) the sellers in the United States, etc. under the US-APA will transfer the business by way of asset sale based on the Chapter 11 Plan under Chapter 11, which is an in-court insolvency proceedings in the United States (equivalent to the rehabilitation

01:23100510.1

9

plan under the Civil Rehabilitation Act); and, as for the sellers under (iii) the EMEA-APA and (iv) the TSAC-APA, it is contemplated that they will transfer the business within the framework of out-of-court restructuring.

As stated in 2(1) above, based on the fact that the Rehabilitation Debtor Group is subject to the Recalls and that judicial actions have been filed in relation to the defects of the PSAN Inflators, in order to insulate KSS from any risks related to the PSAN Inflators, KSS requested that, among the companies belonging to the Rehabilitation Debtor Group: (1) as for companies engaging in manufacture, distribution, sales, etc. of the PSAN Inflators, KSS will only assume the business not related to the PSAN Inflators by way of a business transfer in which the business, assets and receivables/payables (including potential obligations) relating to the PSAN Inflator will remain with the Rehabilitation Debtor Group (in other words, these will not be assumed by KSS); and (ii) as for companies not involved in the manufacture, distribution, sales, etc. of the PSAN Inflators, KSS will assume such companies themselves by way of share transfer.    In addition, KSS requested that (iii) certain companies among the Rehabilitation Debtor Group whose business is almost valueless to KSS shall be excluded from the scope of assumption.    In this global business transfer, the determination on the companies subject to the transfer to KSS and the method of transfer has been made based on KSS's requests as stated in (i) through (iii) above.    Please refer to Attachment 5 as to the treatment of each company belonging to the Rehabilitation Debtor Group.

**(3) Reasonableness of the global allocation of Purchase Price**

As stated in 2(5) above, the total amount which will be the basis of the Purchase Price that the Rehabilitation Debtor Group will receive from KSS globally (i.e., the amount proposed by KSS in the final proposal of sponsor selection process) is 1,588 million US dollars (the "Total Purchase

01:23100510.1

Price").    As the global business transfer from the Rehabilitation Debtor Group to KSS will be conducted under the four (4) business transfer agreements (i.e., the Japan-APA, the US-APA, the EMEA-APA, and the TSAC-APA) as stated in 4(2) above, the Total Purchase Price needs to be allocated among each of these business transfer agreements.

The amount of sale proceeds to be allocated to each business transfer agreement was calculated with the support of Lazard, the financial advisor, and based on the agreement with Jefferies LLC, KSS's financial advisor.    In calculating the allocation amount, firstly, (1) as for each of the European, Mexican and Chinese companies belonging to the Rehabilitation Debtor Group which the business (not share) will be transferred under the framework of out-of-court restructuring, the fair market value evaluated by a third party specialist agency will be allocated (it was KSS's preference to adopt the fair market value evaluated by a third party specialist agency); and (2) as for other companies that will transfer the business (including transfers of shares of subsidiary companies) under the legal restructuring proceedings, (i) firstly allocate the amount remaining after deducting the amount in (1) above from the Total Purchase Price based on the proportion of each company's adjusted net asset value (i.e. the net asset value after adjustment of intercompany receivables and deduction of goodwill) within the entire group, and then (ii) if the amount so allocated to a company based on the proportion of the company's adjusted net asset value is below its liquidation value, the shortfall amount shall be re-allocated to such company on a pro-rata basis until the allocation amount reaches its liquidation value, from other companies which amount allocated based on the proportion of the company's adjusted net asset value exceed their liquidation value.

As stated above, allocation of the Total Purchase Price to companies transferred under the legal restructuring proceedings will be made based on the net asset value thereof. That is because, under the circumstances where no post-transfer business plan of the Rehabilitation Debtor Group

01:23100510.1

11

has been disclosed by KSS, and it is therefore impossible to make the allocation based on future

cash flow calculated based on the business plan, it is reasonable to use the net asset value as the

basis for calculating the allocation amount given that (i) the net asset value is an objective value

stated in the most recent audited financial statements and (ii) the figures can be obtained for each

company and accordingly it is easy to make the allocation of the Purchase Price.   With regards

to the net asset value being used as the basis for the distribution of the Total Purchase Price, from

the standpoint of ensuring an accurate understanding of the value of each company, the figures

stated in the audited financial statement are not used as-is; rather, the figures for the net asset

value after adjustment of the consolidation difference or deduction of goodwill is performed are

used as the basis.

Such method of global allocation of the Total Purchase Price is reasonable since such allocation

is made in an objective manner in accordance with the value of the companies subject to the

business transfer under each of the business transfer agreements.


**(4)   Reasonableness of global allocation of DOJ Restitution Award**

As stated in 2(4) above, the rehabilitation debtor, as a group, is contemplating to make the

payment of DOJ Restitution Award in the amount of 850 million US dollars to the restitution fund

covering the OEMs under the Plea Agreement executed between the rehabilitation debtor and the

DOJ.   The global allocation as to which companies within the Rehabilitation Debtor Group shall

contribute to the DOJ Restitution Award payment will be carried out in accordance with the

following standards.

(i)   Firstly, the companies which are involved in the manufacture and/or sales of airbags

equipped with the PSAN Inflators (the "**Companies Bearing DOJ Restitution Award**") will

be specified and shall bear part of the DOJ Restitution Award.   Since the nature of the DOJ

01:23100510.1

12

Restitution Award is to compensate OEMs who purchased Airbags containing PSAN Inflators from the Rehabilitation Debtor Group it is reasonable to cause the Companies Bearing DOJ Restitution Award to contribute to the payment of the DOJ Restitution Award (the specific method of allocation among the Companies Bearing DOJ Restitution Award shall be as set forth in (ii) and (iii) below).

(ii)    Secondly, among the Companies Bearing DOJ Restitution Award, each of the companies other than the rehabilitation debtor, TK Holdings Inc. ("**TKH**"), Takata Europe ("**TKEUR**"), Takata AG ("**TKAG**") and Takata Sachsen GmbH ("**TKSAC**"), which are the ultimate parents under each of the business transfer agreements among the Rehabilitation Debtor Group, will contribute to the DOJ Restitution Award the payment of the total amount allocated from the Total Purchase Price after deduction of costs accruing in association with the contemplated transaction such as tax burden and liquidation costs.

(iii)    Finally, the remaining amount after deducting the DOJ Restitution Award paid by each of the companies specified above from 850 million US dollars will be borne by, among the Companies Bearing DOJ Restitution Award, the rehabilitation debtor, TKH, TKAG and TKSAC, which are the ultimate parent under each of the business transfer agreements among the Rehabilitation Debtor Group, on a pro rata basis according to the percentage of shipments of the PSAN Inflators.   Such allocation standard regarding the DOJ Restitution Award is reasonable because the amount to be borne by the ultimate parents which have external creditors will be reduced as much as possible and, among the ultimate parents, such amount will be paid according to shipments of the PSAN Inflators.


**(5)    Reasonableness of global allocation of the RTK Related Costs**

01:23100510.1

The Rehabilitation Debtor Group, as a prerequisite to its restructuring, must ensure continued

supply of certain PSAN Inflators after the business transfer to KSS in order to continue to support the Recalls as requested by some of the customers to the Rehabilitation Debtor Group.    On the other hand, as stated in 4(2) above, KSS will become the sponsor of the Rehabilitation Debtor Group on condition that it will not assume any PSAN-related assets in order to insulate the risks and liabilities relating to the PSAN Inflators.    Therefore, the rehabilitation debtor needs to continue PSAN related businesses at each company which will remain within the Rehabilitation Debtor Group ("**RTK**").

In order for RTK to continue its business, various cost would be necessary such as: (1) cost necessary for shipping, warehousing and disposal of PSAN Inflators; (2) cost related to the monitors for the NHTSA and the DOJ to monitor the PSAN related businesses; (3) fees to be paid to the special master who will allocate the DOJ Restitution Award; (4) cost for facilities to manufacture PSAN Inflators; and (5) labor cost and indirect cost necessary to secure the safety of desiccated inflators (collectively, the "**RTK Related Costs**"). It is contemplated that the RTK Related Costs will be handled as follows:

Firstly, the cost necessary for shipping, warehousing and disposal of PSAN Inflators as set forth in (1) above is planned to be borne by each region among the Rehabilitation Debtor Group. Further, it is planned that the rehabilitation debtor will bear only the cost necessary for shipping, warehousing and disposal of PSAN Inflators received from OEMs prior to the closing of the business transfer to KSS, and after the closing, the OEMs will bear such cost (by conducting either by themselves or by outsourcing to RTK).    Next, each of the cost of (2), (3), (4) and (5) will be borne by the rehabilitation debtor, TKAM, TKH, TKEUR, TKSAC and TKAG which are the ultimate parents under each of the business transfer agreements, in accordance with the percentage of their respective shipments of the PSAN Inflators which have already been or are potentially subject to recalls.    In addition, should there be any shortage in the cost necessary for

01:23100510.1

14

RTK, it is contemplated that, pursuant to the Backstop Agreement dated November 16, 2017 (as amended) which was separately entered into by and between KSS, the OEMs and the Rehabilitation Debtor Group, KSS will bear part of the RTK Related Costs (which is defined as the PSAN Legacy Cost in the said Backstop Agreement ) up to a certain amount.

As for the treatment under the rehabilitation plan of the RTK Related Costs to be borne and paid by the rehabilitation debtor, see the catch-up rule in 5(4) below.

Such allocation standards are reasonable because, with regard to the cost for (1), each region will bear the cost for shipping, warehousing and disposal of PSAN Inflators which are necessary in the respective regions, and with regard to each of the cost for (2), (3), (4) and (5), the RTK Related Costs will be substantially allocated among the Rehabilitation Debtor Group,; and, within the Rehabilitation Debtor Group, the RTK Related Costs which are the costs for the PSAN inflator related businesses will be allocated in accordance with an objective standard, namely, shipments of the PSAN Inflators.

**(6)   Summary**

For the reasons stated above, it can be said that the entire framework of the global business transfer to KSS is reasonable.

**5 Appropriateness of Business Transfer pursuant to Japan-APA**

  **(1) Outline of Japan-APA**

As described in 4(2) mentioned above, Japan-APA stipulates that, as a part of the global business transfer from the Rehabilitation Debtor Group to KSS, the rehabilitation debtor, TK9 and TKS, which are Japanese entity, as sellers, shall transfer the business in Japan and other Asian countries operated by the Rehabilitation Debtor Group.   Please refer to the Appendix 6 with

01:23100510.1

15

regard to the outline of each clauses of Japan-APA.

**(2)   Appropriateness of the Amount of Consideration for the Business Transfer pursuant to the Japan-APA**

The base purchase price which will be paid to the rehabilitation debtor out of the consideration for the business transfer under the Japan-APA, shall be approximately 319.5 million US dollars, the amount of which is calculated by using the allocation method described in 4(3) above (the "**Base Business Transfer Price**".   "Individual Seller Base Price for TKJP" which is defined in Clause 3.1 of the Japan-APA correspond to this but, as stipulated in Section 3.2 of the Japan APA, the amount of the Base Business Transfer Price is different from the amount stipulated in Section 3.1 of the Japan-APA due to the adjustment of the price for the business transfer in light of the treatment of inter-company indebtedness and the valuation of fair trade value of certain legal entities in the Rehabilitation Debtor Group by professional organizations.)   The Base Business Transfer Price is calculated by reasonably allocating the entire consideration of the Business Transfer, the amount of which was the highest amount among the proposals by sponsor candidates in a fair procedure as described in 4(1) above.   Thus, the method of calculation is appropriate.

The amount of consideration which the rehabilitation debtor will actually receive (the "**Business Transfer Price after Adjustment**") shall be an amount which is calculated by deducting certain adjustment amounts based on the following adjustment items which are stipulated in Section 3.1 (ii) to (xii) of the Japan-APA (As for the definitions of Regional Share Percentages, Cash Allocation Share and Purchase Price Share and other details, please refer to the Appendix 6.)

01:23100510.1

【Adjustment Items of the Base Business Transfer Price】

16

(i)   Sum of the outstanding indebtedness under loans and other financial arrangements owed by subsidiaries of the rehabilitation debtor, the shares in which shall be transferred under the Japan-APA. As for the definitions of Regional Share repaid by the funds KSS will provide at the closing of the Japan APA（Section 3.4 of the Japan-APA).

(ii)   Sum of the money the non-debtor subsidiaries of the rehabilitation debtor, the shares in which shall be transferred under the Japan-APA, shall pay in accordance with the OEM Settlement Agreement which such subsidiaries and OEMs have executed.   KSS shall make such payment on behalf of the subsidiaries of the rehabilitation debtor at the closing of the Japan-APA (Section 3.3(d) of the Japan-APA).

(iii)   Sum of the amount of the repaid receivables (which shall be limited to those which would not have been repaid by the closing if Japan -APA were not to be executed) received by the entities, of which business or shares shall be the subject of transfer under Japan-APA, by the date of the closing pursuant to the terms of the Accommodation Agreement executed on June 26, 2017 by such entities and OEMs (the "**Japan-APA**") (provided however, the amount the repaid receivables which TK9 and TKS received shall be excluded).

(iv)   The amounts which the OEMs have paid to the entities of which business or shares shall be the subject of transfer under the Japan-APA, if such OEMs exercise the Equipment Option pursuant to the terms of the Japan-AA (provided however, the amounts in relation to the Equipment Option exercised to TK9 and TKS shall be excluded).

01:23100510.1

(v)   Taxes imposed on KSS on transferring the business of the rehabilitation debtor, provided

17

however, which excludes Japanese consumption tax and Chinese value added tax and other taxes parallel ( the "**VAT**").

(vi) The amount of unrecoverable VAT imposed on KSS on transferring the business of the rehabilitation debtor.   KSS shall pay such unrecoverable VAT by utilizing such deducted amount.

(vii) The amount of the certain portion of the unrecoverable VAT allocated to the rehabilitation debtor based on the Purchase Price share, out of the amount allocated to the Sellers under Japan-APA based on the Reginal Share Percentage from the aggregated amount of refundable VAT imposed on KSS on the global business transfer with the Rehabilitation Debtor Group.   KSS shall pay the recoverable VAT, which is imposed on the business transfer conducted by the rehabilitation debtor, by utilizing such deducted fund and in case where such VAT is actually recovered, such recovered VAT shall be deposited in the Regulatory Escrow which will be set up in accordance with the Regulatory Escrow Agreement executed by the Rehabilitation Debtor Group and KSS.   In case where the Rehabilitation Debtor Group become obliged to pay fines by the governmental authority of each country on the ground of violation of competitive law, KSS may pay a portion of such fine which exceeds 10 million US dollars by the fund deposited in Regulatory Escrow.   KSS shall return the remainder of such fund deposited in Regulatory Escrow to the Rehabilitation Debtor Group within 30 months after the Closing of each business transfer agreement at the latest (the allocation of such refund the Rehabilitation Debtor Group will receive shall be based on the     Regional Share Percentage.).

(viii) In case where the sum of the cash or cash equivalent which shall be transferred to KSS falls below 435 million US dollars globally, a portion of such deficiency which is allocated to the Sellers of the Japan-APA in accordance with Regional Share Percentages and further is allocated to the rehabilitation debtor in accordance with Purchase Price Share.   In case where the sum of the cash of cash equivalent which shall be transferred to KSS exceeds 435 million US dollars globally, up to a ceiling of the global total sum of 50 million US dollars, the amount of money exceeding 435 million US dollars is allocated in accordance with the same manner of calculation shall be added to the business transfer price paid to the rehabilitation debtor.

(ix)  The amount of the transaction costs KSS incurred for the purpose of global business transfer (subject to the ceiling of 50 million US dollars) which is allocated to the Sellers of the Japan-APA in accordance with Regional Share Percentages and further is allocated to the rehabilitation debtor in accordance with Purchase Price Share out of the transaction costs. In the matter of large scaled acquisition such as this one, especially in the US practice, it is commonly seen that the seller reimburses the transaction costs incurred the buyer and it is not unreasonable that the Rehabilitation Debtor Group reimburses a part of the transactions costs incurred by KSS.

(x)  The amount of any receivables of any entities, which are subject to the business transfer or the share transfer under Japan-APA, set off by any OEMs at Closing in respect of any DOJ Restitution Payment (provided however, such amount excludes the amount to be allocated to TK9 and TKS).

01:23100510.1

All adjustment items above are reasonable because such adjustment items are intended to adjust the purchase price in case where KSS pays any fund which should have paid by the Rehabilitation Debtor Group, in case the enterprise value, which the parties premised on, changes, or in other similar cases, in accordance with some objective calculation methods.   In addition, as mentioned in 8(2) below, in case where the rehabilitation debtor receives Business Transfer Price after Adjustment by consummating the business transfer with KSS, the rehabilitation debtor can distribute at an rate exceeding that in case that the rehabilitation debtor liquidated.   Thus, the provisions regarding business transfer under the Japan-APA is reasonable as a whole.

**(3)   Appropriateness of bearing the DOJ compensation by the rehabilitation debtor**

As described in 2(4) above, the Rehabilitation Debtor Group will be paying 850 million US dollars for the DOJ Restitution Fund for OEMs in accordance with the Plea Agreement and the rehabilitation debtor shall pay approximately 113.2 million US dollars, which is allocated in accordance with the rules described in 4(4) above, (the "**Allocated DOJ Payment**") out of the consideration for the business transfer the rehabilitation debtor will receive (Section 3.3 (a) of the Japan-APA).

Such payment of Allocated DOJ Payment by the rehabilitation debtor is appropriate because the amount of such payment is determined by allocating DOJ Restitution Payment, the payment of which is essential for continuing the global business of the Rehabilitation Debtor Group, within the Rehabilitation Debtor Group in accordance with a reasonable rule.

In addition, it is expected that OEMs, in addition to the distributions they would be receiving as general unsecured creditors, will be compensated from the DOJ Restitution Fund in accordance with the Plea Agreement.   Therefore, under the rehabilitation plan, in order to ensure the fair and

01:23100510.1

equal treatment of creditors, the rehabilitation debtor's allocable portion of the DOJ Restitution Payment will be deemed a recovery on account of the OEMs' rehabilitation claims against the rehabilitation debtor. To this end, the rehabilitation plan will provide that the OEMs shall not be entitled to receive any additional recoveries on account of their rehabilitation claims against the rehabilitation debtor until other creditors receive distributions on account of their allowed claims in an amount that results in the same recovery rate as that for OEMs (catch-up rule), and the OEMs have agreed to support it.   Such treatment is intended to protect the interests of the creditors other than OEMs from the perspective of equity.

**(4) Appropriateness of bearing the RTK related cost by the rehabilitation debtor**

As described in 4(5) above, the Rehabilitation Debtor Group needs to contribute the RTK Related Cost and the rehabilitation debtor shall pay approximately 44.6 million US dollars (expected to increase slightly in the future), which are allocated from such cost in accordance with some rules out of Business Transfer Price after Adjustment.   Such payment of the RTK Related Cost by the rehabilitation debtor is appropriate because the amount of such payment is determined by allocating the cost which is essential for continuing PSAN business by the Rehabilitation Debtor Group which was the essential basis of the business transfer to KSS.

In addition, as part of their support of the business transfer to KSS and conditioned upon the approval of this Petition for Approval for Business Transfer, the OEMs have agreed that   the rehabilitation debtor's payment of its allocable portion of the RTK Related Cost will be deemed a partial recovery on account of the OEMs' rehabilitation claims against the rehabilitation debtor, and as a result, the rehabilitation plan will provide that OEMs shall not be entitled to receive additional recoveries on account of their rehabilitation claims until other creditors receive distributions on account of their allowed claims that result in the same recovery rate as that for

01:23100510.1

OEMs (catch-up rule). Such treatment is intended to protect the interests of the creditors other than OEMs from the perspective of equity.


### (5)  Appropriateness of the Treatment of Employees

The Japan-APA stipulates that, in principle, KSS shall retain all employees who work for the rehabilitation debtor at Closing (excluding temporary employees such as dispatched employees, contact employees, and advisors) on the same or better conditions (including employee benefits) than that prior to the business transfer.   Provided, however, the head office function of the Rehabilitation Debtor Group is forced to be downscaled due to the plan that the global head office function of the Rehabilitation Debtor Group will be transferred to overseas.   Considering such situation, KSS is exceptionally entitled not to offer the employment of those employees working at head office function in Tokyo upon good consultation with the Sellers (Section 8.1 of the Japan-APA).   The range of the employees KSS will not offer will be determined in future consultation between KSS and the rehabilitation debtor.   As above, the employees of the rehabilitation debtor are properly protected because KSS will take over the employment of the employees of the rehabilitation debtor and the employment conditions of such employees are the same as or better than that prior to the business transfer.


### (6)  General Overview

Therefore, the content of the Japan-APA is appropriate.


### 6. The business transfer pursuant to the Japan-APA is likely to be consummated as planned.

### (1) Overview

Upon the execution of the Japan-APA, the business transfer pursuant to Japan-APA will be implemented when (i) the Japan-APA is not terminated based on the parties' termination rights stipulated in the Japan-APA and (ii) all conditions precedent for closing stipulated in the Japan-APA are either fulfilled or waived.  While particularly important termination rights or conditions precedents to the closing of the business transfer (termination rights) are as described below, given that these termination rights have either been waived or expired, it is likely that the business transfer pursuant to the Japan-APA will be consummated.

**(2) Obtaining consents from Non-Consenting OEMs**

Under the Japan-APA, in connection with a certain agreement among KSS and OEMs which aim to allocate the potential risks in the future among KSS and OEMs, in case where a sufficient number of the OEMs who had not been parties to such agreements at the time of the execution of the Japan-APA ("Non-Consenting OEMs") do not become the parties to such agreements by January 2, 2018, KSS may have terminated the Japan-APA (4.4(d)(ii) of Japan APA). However, up to the date hereof, it has already become clear that such termination right does not accrue.

**(3) Obtaining consents from DOJ and NHTSA**

Whereas the business of the Rehabilitation Debtor Group has been supervised and monitored by each of NHTSA and DOJ pursuant to the Consent Order and the Plea Agreement respectively, one of the conditions precedent under the Japan APA for KSS to consummate the business transfer is that KSS has secured written agreements with DOJ and NHTSA to narrow the scope of such supervision and monitor, (Article 9.1(o) of Japan-APA). While such termination right has certain periodic limitation, KSS has not terminated by such period on ground that KSS had reached certain agreement with each of DOJ and NHTSA respectively. Accordingly, to the date,

01:23100510.1

23

KSS has already been deemed to waive this condition precedent.

**(4) Summary**

As stated above, there is a sufficient likelihood the business transfer based on the Japan-APA is likely to be implemented.

**7. Amendment agreements**

Amendments to the Japan APA have been executed for the sake of extension of period needed for obtaining the consents from Non- Consenting OEMs to become parties to the IRA (First Amendment to Asset Purchase Agreement dated December 3, 2017 (Exhibit 2), Second Amendment to Asset Purchase Agreement dated December 25 (Exhibit 3) and Third Amendment to Asset Purchase Agreement dated January 15, 2018 (Exhibit 4), which is to decrease the amount of the Break-Up Fee (Article 4.6 of Japan-APA) reflecting the opinion of the US Bankruptcy Court).   Since the contents of such amendments are reasonable respectively, executions of each of the amendments are necessary and appropriate.

**8. Rehabilitation plan based on the completion of the business transfer pursuant to the Japan-APA is likely to be confirmed.**

**(1) Summary of the contemplated rehabilitation plan following the completion of the business transfer to KSS**

The rehabilitation debtor contemplates, on the assumption of the completion of the business transfer to KSS, that it will develop a liquidation-type rehabilitation plan in which the rehabilitation debtor will dissolve/liquidate after distributing to rehabilitation creditors the amount which have been deducted certain amount stated in the following 8 (2) from the Business Transfer Price after

01:23100510.1

Adjustment.

As described in the following (2), the contemplated rehabilitation plan satisfies the principle of assurance of liquidation value, further, the rehabilitation plan will include certain provisions to take into account the interests of the creditors other than the OEMs.  That is, as described in the aforementioned 5 (3) and (4), the rehabilitation debtor will make payment the DOJ Restitution Payment and the RTK Payment from the Business Transfer Price after Adjustment. Such payments are imperative to globally restructure and maximize the business value of the rehabilitation debtor and maximize the amount available for distribution to all creditors, and therefore, it the payments are necessary to ensure the interests of the entirety of the creditors. However, from the perspective of equity, for the purpose of providing additional protection to the interests of the creditors other than the OEMs, the rehabilitation plan will provide that the OEMs shall not be entitled to receive any additional recoveries on account of their rehabilitation claims against the rehabilitation debtor until other creditors receive distributions on account of their allowed claims in an amount that results in the same recovery rate as that for OEMs (catch-up rule), and the OEMs have agreed to support it.

**(2) Rehabilitation plan satisfies the principle of assurance of liquidation value**

Assuming that the rehabilitation debtor goes bankrupt and liquidates the business without the business transfer, as shown the Asset Valuation Report attached as Exhibit 7, the bankrupt/liquidating distribution ratio will be approximately 0.94 % because the aggregate amount of the available fund for distribution will be approximately JPY 10.121 billion, while the total amount of rehabilitation claims is approximately JPY 1,075.564 billion (provided, however, that such amount includes approximately JPY 246.365 billion, as the amount of the Recall Claims that have not become subject to the recall regarding the PSAN Inflator as of August 25, 2017 (the

01:23100510.1

25

"**Gamma Recall Claims**").    However, as explained below, the rehabilitation plan satisfies the principle of assurance of liquidation value because the percentage of distributions against common rehabilitation creditors in rehabilitation proceedings exceed such percentage of bankrupt/liquidating distributions.    The liquidating distribution ratio (the percentage of payments) in bankruptcy proceedings or rehabilitation proceedings is determined by (i) the amount of claims subject to the distributions (payments) and (ii) the amount of the available fund for distributions.

First, with respect to (i), the amount of claims subject to payment in rehabilitation proceedings depends on, among other things, whether claims disputed are confirmed or not, but, basically, claims confirmed in rehabilitation proceedings would be confirmed in bankruptcy proceedings as well.    However, in the bankruptcy procedure, there will be distributions to the Gamma Recall Claims or claims submitted by DOJ (excluding DOJ Restitution Payment), while there will not be any distributions in the civil rehabilitation procedures.    As such, the amount of the claims to be distributed will be larger in bankruptcy procedure than civil rehabilitation procedure.

Next, with respect to (ii), the amount of available funds under the liquidation scenario would be approximately JPY 10.121 billion, as stated above.    In comparison, the amount of available funds upon the consummation of the business transfer to KSS would be the amount remaining after deducting (d) the claims with priority such as administrative claims from the sum of (a) the Business Transfer Price after Adjustment, (b) excess cash held by the rehabilitation debtor from prior to the business transfer, and (c) the estimated amount of recoveries, on account of rehabilitation claims or distributions, that the rehabilitation debtor is to receive from TK9 and TKS which are not insolvent subsidiaries.    Such amount is expected to exceed JPY 18 billion based on the current forecast of the cash flow (provided, however, that as a result of the aforementioned catch-up rule being applied, the sum of the Allocated DOJ Payment (approximately 113.2 million US dollars) and RTK Related Costs (approximately 44.6 million US dollars) (i.e.,

01:23100510.1

26

approximately 157.8 million US dollars) will be deemed equivalent to the recovery on account of the OEMs' rehabilitation claims, the rehabilitation creditors other than the OEMs will be able to receive prioritized repayment up to the same recovery rate at which the OEMs receive the payment from the aforementioned sum (i.e., approximately 157.8 million US dollars) (calculated based on the conversion rate of 1 US dollar to 113 yen; provided, however, that all of these amounts are mere forecasts at this time, and any of such amounts could fluctuate based on the cash flow and operations, etc. of the entire Rehabilitation Debtor Group in the future). Accordingly, the percentage of distributions in the rehabilitation plan is believed to be higher than the percentage of bankruptcy/liquidation distributions, and it is, therefore, apparent that the percentage of the distributions in the rehabilitation plan under the business transfer to KSS satisfies the principle of assurance of liquidation value.

As stated in 5(3) and (4) above, as it is planned that the catch-up rule will be applied, we believe that payment of the Allocated DOJ Payment and the RTK Related Costs will not affect the percentage of the distributions to the rehabilitation creditors other than the OEMs.

**(3) Rehabilitation plan satisfies the other requirements**

In addition to the preceding (2), there are no facts in proposed rehabilitation plan applying to "contravene provisions of any laws" (Article 174(2)(i) of Civil Rehabilitation Act) nor "unlikely to be consummated" (Article 174(2)(ii)) nor "contrary to the common interest of rehabilitation creditors" (Article 174(2)(iv)).

**9. Conclusion**

As stated above, the business transfer based on the Japan-APA is necessary and appropriate, and is likely to be implemented, further, rehabilitation plan with the business transfer is likely to be

01:23100510.1

made an order of confirmation. Accordingly, I hereby file this petition.

**Exhibit**

1.   Japan Asset Purchase Agreement

2.   First Amendment to Asset Purchase Agreement

3.   Second Amendment to Asset Purchase Agreement

4.   Third Amendment to Asset Purchase Agreement

5.   Transferred entities and the method of transfer to KSS

6.   Summary of Japan-APA

7.   Asset Valuation Report

01:23100510.1